UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GEGE WASHINGTON UNIVERSITY HOSPITAL<br>900 23rd Street NW<br>Washington, DC 20037,<br><br>    Plaintiff,<br><br>  v.<br><br>ALEX M. AZAR II,<br>Secretary of Health and Human Services,<br>200 Independence Avenue, S.W.<br>Washington, DC 20201,<br><br>    Defendant. | Case No.: |

## COMPLAINT

### I. INTRODUCTION AND NATURE OF SUIT

1. The Medicare statute compensates hospitals for the costs they incur in treating Medicare beneficiaries. Many hospitals provide graduate medical training for resident physicians. Their costs of operating these educational programs are part of their overhead costs for providing care to all of their patients, including Medicare beneficiaries. The Medicare statute thus provides for an annual payment to hospitals to pay Medicare's share of the hospitals' direct graduate medical education, or DGME, costs, subject to a statutory cap on those costs. *See* 42 U.S.C. § 1395ww(h)(1).

2. Many hospitals train "fellows," that is, physicians who are continuing their medical education beyond the minimum period needed for board certification. The costs of training fellows, like the costs of training physicians who are beginning their residencies, are part of a hospital's DGME costs. Congress has provided that the Medicare program will reimburse

hospitals for Medicare's share of training fellows, albeit at a reduced rate that reflects the fellows' greater levels of experience. *See* 42 U.S.C. § 1395ww(h)(4)(C).

3. The Secretary of Health and Human Services issued a regulation, 42 C.F.R. § 413.79(c)(2)(iii), that violates the statute and undermines Congressional intent. The Secretary's regulation penalizes hospitals that train fellows and whose DGME programs are operating above the statutory cap (creating, in effect, a "fellow penalty") by reducing the hospital's reimbursement below the statutory cap incrementally for each additional fellow the hospital trains. The fellow penalty regulation has no basis in the statute that the Secretary purports to interpret. The fellow penalty regulation is also irrational as Congress did not intend for the Secretary to financially *penalize* hospitals for training fellows, or to reduce its appropriate level of annual DGME payments but for the mere fact that these fellows are providing valuable patient-care services to Medicare beneficiaries as part of their formal physician training.

4. George Washington University Hospital ("GWU Hospital"), the Plaintiff in this action, trains fellows in its graduate medical education program, and that program operated above the statutory cap for the cost reporting period at issue here. Under the Medicare statute, GWU Hospital should be reimbursed for its costs in training fellows to the full extent permitted by the statutory cap. But under the Secretary's fellow penalty regulation, the Medicare program actually reduced GWU Hospital's DGME reimbursement for each fellow it trains. Because the fellow penalty regulation violates the statute, and is arbitrary and capricious, GWU Hospital brings this action seeking both to invalidate the fellow penalty regulation and to obtain a proper calculation of the Medicare reimbursement owed for its DGME costs.

## II. PARTIES

5. GWU Hospital, the Plaintiff in this action, participates in the Medicare program and has been assigned Medicare Provider No. 09-0001. GWU Hospital's cost reporting period at issue is for hospital fiscal year 2015.

6. The Defendant, Alex M. Azar II, the Secretary of the United States Department of Health and Human Services ("HHS"), is sued in his official capacity. HHS is the Federal agency that administers the Centers for Medicare & Medicaid Services ("CMS"). CMS is the Federal agency to which the Secretary has delegated administrative authority over the Medicare program, which is established under title XVIII of the Social Security Act. *See* 42 U.S.C. § 301 *et seq.* References to the Secretary herein are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

## III. JURISDICTION AND VENUE

7. This action arises under the Medicare statute, title XVIII of the Social Security Act, 42 U.S.C § 1395 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559 and 701-706.

8. Jurisdiction is proper under 42 U.S.C. §§ 1395oo(a)(1)(A)(ii) and 1395oo(f)(1).

9. Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(1).

## IV. BACKGROUND

### A. The Medicare Statute Provides for Hospitals to Be Reimbursed for the Cost of Training All of Their Residents, Including Fellows.

10. The Medicare statute recognizes that the "reasonable costs" hospitals incur in treating Medicare beneficiaries include "direct graduate medical education costs," that is, the "direct" costs of hosting graduate medical training programs for physician residents. 42 U.S.C. § 1395ww(h)(1).

11. Under Medicare, *all* reimbursable costs must be "related to patient care." *See*, *e.g.*, 42 C.F.R. § 413.9 ("All payments to providers of services must be ... related to the care of beneficiaries"). DGME payments are no exception.[1] *See* 54 Fed. Reg. 40,286, 40,302 (Sept. 29, 1989) ("We are guided by the general principle that, to be allowable at all, the costs must be related to patient care furnished in the hospital, and, to be allowable as a direct GME cost, the costs must be related to the GME program in the hospital"); *see also* Provider Reimbursement Manual § 2100 ("All payments to providers of services must be based on the reasonable cost of services covered under title XVIII of the Act and related to the care of beneficiaries ..."). The Secretary has therefore recognized that reimbursement is provided for residents and fellows, at least in part, for the valuable physician services they provide to Medicare beneficiaries: "[only] services that are *both* related to the care and treatment of the hospital's patients and furnished in support of the training of interns and residents meet the requirements for payment." 54 Fed. Reg. at 40,302.

12. The statute thus provides that the Medicare program will reimburse a hospital for the portion of the hospital's DGME costs attributable to its treatment of Medicare beneficiaries. *Id.*[2] These costs include the salaries of teaching physicians and stipends paid to resident physicians in approved programs. *See* S. Rep. No. 404, 89th Cong., 1st Sess. 36 (1965); H.R. No. 213, 89th Cong., 1st Sess. 32 (1965).

---

[1] The Medicare Payment Advisory Commission ("MedPAC") has explained that "Medicare is paying not for training costs but rather for patient care." Medicare Payment Advisory Commission, *Report to Congress: Rethinking Medicare's Payment Policies for Graduate Medical Education*, at 8 (1999). This is because residents provide "patient care and other services in conjunction with their training that are of value to the institution where they train, while accepting compensation for the services they provide that is lower than they might otherwise be able to earn given their skill level." *Id.* at 7. It therefore follows that the "direct GME costs that hospital report on their Medicare cost reports represent the net value of the patient care services residents provide." *Id.* at 8.

[2] Before the implementation of the Medicare prospective payment system in 1983, the costs of resident physician services furnished to Medicare beneficiaries, which are now paid under "GME," were paid on a reasonable cost basis under Medicare Part A. *See* Social Security Act §§ 1814(b)(1), 1861(v)(1)(A).

13. The Medicare statute prescribes a formula for computing annual DGME payments to hospitals. 42 U.S.C. § 1395ww(h). A hospital with an approved graduate medical education program receives a "payment amount" for each cost reporting period that is calculated to be equal to the product of three factors. 42 U.S.C. § 1395ww(h)(3)(A). The first factor is "the hospital's Medicare patient load," which is the fraction of the hospital's inpatient treatment days attributable to Medicare Part A and Part C beneficiaries. 42 U.S.C. § 1395ww(h)(3)(A)(ii), (h)(3)(C), (h)(3)(D). The second factor is the "hospital's approved FTE resident amount," which is a calculation of the hospital's average cost per resident. 42 U.S.C. § 1395ww(h)(2), (h)(3)(A)(i), (h)(3)(B)(i). The third factor is "the weighted average number of full-time-equivalent residents . . . in the hospital's approved medical residency training programs" in the cost reporting period. 42 U.S.C. § 1395ww(h)(3)(A)(i), (h)(3)(B)(ii). This third factor is also known as the "resident FTE count." Only this third factor is at issue in this litigation.

14. As the name suggests, the resident FTE count is intended to represent the total number of residents a hospital trains in a given cost reporting period. This number, multiplied by the hospital's average cost per resident and multiplied again by the hospital's Medicare patient load, determines the amount that the Secretary pays the hospital to cover the Medicare program's share of the costs of the hospital's graduate medical education program.

15. The Medicare statute does not provide for payment based simply on a raw count of the number of the hospital's full-time-equivalent residents. Instead, payment is based on the hospital's "weighted average number of full-time-equivalent residents" in its training program. 42 U.S.C. § 1395ww(h)(3)(B)(ii). The formulas for determining the "weighted" number and the "average" number are set forth in 42 U.S.C. § 1395ww(h)(4).

16. The FTE count is "weighted" to reflect the likelihood that a hospital incurs greater costs for a resident at the beginning of his or her residency than it does for a resident who is nearing the completion of that education. The statute thus provides that, "in calculating the number of full-time-equivalent residents in an approved residency program ... for a resident who is in the resident's initial residency period ... the weighting factor is 1.00." 42 U.S.C. § 1395ww(h)(4)(C)(ii). The initial residency period is the minimum number of years of formal training needed to meet the requirements for initial board eligibility in the resident's particular specialty. 42 U.S.C. § 1395ww(h)(5)(F), (G).

17. Residents who continue in a hospital's graduate medical education program beyond their initial residency period are commonly referred to as "fellows." The statute recognizes that a hospital will continue to incur costs in training fellows, albeit at a lower rate than the hospital incurs for more junior residents, and that the Medicare program should pay its fair share of these costs. The statute thus assigns a reduced (but still positive) weighting factor for fellows: "in calculating the number of full-time-equivalent residents in an approved residency program ... for a resident who is not in the resident's initial residency period ... the weighting factor is .50." 42 U.S.C. § 1395ww(h)(4)(C)(iv). Thus, the actual count of a hospital's full-time equivalent residents who are in their initial residency period (IRP), plus one-half of the actual count of the hospital's full-time equivalent residents who are fellows, equals the "weighted ... number of full-time-equivalent residents." By way of example, a hospital that trained 10 IRP residents and 10 fellows would have a weighted FTE count of 15.

18. The "average" number of full-time equivalent residents is determined by calculating the average of the hospital's actual count of full-time-equivalent residents for the current cost reporting period and each of the two preceding periods:

> [T]he total number of full-time equivalent residents for determining a hospital's graduate medical education payment shall equal the average of the actual full-time equivalent resident counts for the cost reporting period and the preceding two cost reporting periods.

42 U.S.C. §1395ww(h)(4)(G)(i). That average, after the application of the weighting factors described above, determines the "weighted average number of full-time-equivalent residents" for which the Medicare program makes payment. 42 U.S.C. § 1395ww(h)(3)(B)(ii). By way of example, a hospital that trained 10 IRP residents and 10 fellows in its second-to-last cost reporting period, 12 IRP residents and 12 fellows in its last cost reporting period, and 14 IRP residents and 14 fellows in its current cost reporting period would have a weighted average FTE count of 18.

19. That "weighted average number" is subject to a statutory cap. Since 1997, the Medicare statute has placed a limit on the number of resident FTEs in the fields of allopathic and osteopathic medicine that a hospital can count in a given year. This limit, known as the "FTE cap," is set by the number of unweighted FTEs that the hospital reported on its most recent cost reporting period ending on or before December 31, 1996. In this regard, the statute states:

> [F]or purposes of a cost reporting period beginning on or after October 1, 1997 ... the total number of full-time equivalent residents before application of weighting factors (as determined under this paragraph) with respect to a hospital's approved medical residency training program in the fields of allopathic medicine and osteopathic medicine may not exceed the number (or, 130 percent of such number in the case of a hospital located in a rural area) of such full-time equivalent residents for the hospital's most recent cost reporting period ending on or before December 31, 1996.

42 U.S.C. § 1395ww(h)(4)(F)(i). This paragraph, read together with the provisions defining the calculation of the "weighted average number" of full-time-equivalent residents, sets forth a rule that the Medicare program will reimburse hospitals for the costs of training all of their residents—IRP residents and fellows alike—up to the statutory cap.

### B. The Secretary's Regulation Penalizes Hospitals for Training Fellows.

20. The Secretary's "fellow penalty" regulation violates this statutory directive. Rather than reimbursing hospitals for their costs of training both IRP residents and fellows up to the statutory FTE cap, and for the valuable services they provide to Medicare beneficiaries, the Secretary's regulation actually *reduces* the total amount of reimbursement to hospitals more and more for each fellow they train.

21. The statute directs the Secretary to "establish rules ... for the computation of the number of full-time-equivalent residents in an approved medical residency training program." 42 U.S.C. § 1395ww(h)(4). In a purported exercise of this authority, the Secretary adopted a regulation for instances where the actual number of residents trained by a hospital in the cost reporting year exceeds the hospital's FTE cap.

> If the hospital's number of FTE residents...exceeds [the FTE cap or limit], the hospital's weighted FTE count (before application of the limit) ... will be reduced in the same proportion that the number of FTE residents for that cost reporting period exceeds the [FTE cap or limit].

42 C.F.R. § 413.79(c)(2)(iii).

22. As mentioned above, the statute provides that a hospital's unweighted FTE count is adjusted by weighting factors depending on the status of the residents (in the first example in paragraph 17 above, 20 FTEs are reduced to 15). 42 U.S.C § 1395ww(h)(4)(C). The Secretary's regulation unlawfully further reduces a hospital's weighted FTE count in cases in which the hospital trains residents (whether IRPs or fellows) above the FTE cap. In cases where a hospital

has trained residents in excess of the statutory FTE cap, the regulation replaces the statutory formula for determining the "weighted ... number" of FTE residents with a new formula that multiplies the statutory weighted FTE count by a new fraction consisting of the hospital's FTE cap (numerator) and the number of unweighted FTEs the hospital reported in that cost reporting year (denominator).

23. The Secretary's formula for double weighting the FTE count in 42 C.F.R. § 413.79(c)(2)(iii) has no basis in the text of the statute that it purports to interpret. Moreover, the regulation produces irrational results. If a hospital is training residents in excess of its cap, and some of its residents are fellows, under the regulation each fellow the hospital reports in excess of its cap will actually *reduce* its overall DGME reimbursement. That is, the regulation inexplicably imposes a "fellow penalty."

24. The following hypotheticals demonstrate the fellow penalty at work. Hospital A has an FTE cap of 100. In Year 1, Hospital A trains 100 IRP residents and zero fellow residents. Hospital A's unweighted FTE count is 100, and its weighted FTE count is also 100. Since Hospital A is not operating above its cap, it can claim all 100 of its weighted FTEs for reimbursement in the present year.

25. In Year 2, Hospital A trains 200 IRP residents and zero fellow residents. Hospital A's unweighted FTE count is 200. Because Hospital A's unweighted FTEs are in excess of its cap, it cannot claim its 200 weighted FTEs for reimbursement in the present year. The number of FTEs that Hospital A can claim in Year 2 is limited to its allowable FTE count, as calculated in accordance with in 42 C.F.R. § 413.79(c)(2)(iii). On these facts, the allowable FTEs formula produces a result of 100, which is equal to Hospital A's FTE cap. Hospital A is not subject to the fellow penalty in Year 2 because it is not training any fellows.

26. In Year 3, Hospital A trains 200 IRPs and 100 fellows. Hospital A's unweighted FTE count is 300, and its weighted FTE count is 250. As was the case in Year 2, Hospital A is operating above its cap, which means the number of FTEs it can claim in Year 3 is again limited to its allowable FTEs. Hospital A's allowable FTEs in Year 3 under the Secretary's regulation is equal to 250 weighted FTEs x (100 FTE cap / 300 unweighted FTEs), or 83.33. Notably, Hospital A's present-year FTEs are 16.67 lower in Year 3 than they were in Years 1 and 2, when Hospital A trained zero fellows.

27. Hospital A's FTE count – and therefore its reimbursement – will continue to decrease as it takes on more fellows. In Year 4, Hospital A trains 200 IRP residents and 200 fellow residents. Hospital A's unweighted FTE count is now 400 and its weighted FTE count is 300. Under the Secretary's regulation, Hospital A's allowable FTEs in Year 4 is equal to 300 weighted FTEs x (100 FTE cap / 400 unweighted FTEs), or 75. Hospital A's present-year FTEs are lower in Year 4 than in Years 1 and 2 when Hospital A no fellows, and lower than in Year 3 when Hospital A trained only half as many fellows. The effect of the regulation on Hospital A's Medicare reimbursement for Years 1, 2, 3, and 4 is detailed in the following table:

|  | Cap | IRPs | Fellows | Unweighted FTEs | Weighted FTEs | Allowable FTEs | Reimbursable FTEs |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Year 1 | 100 | 100 | 0 | 100 | 100 | NA | 100 |
| Year 2 | 100 | 200 | 0 | 200 | 200 | 200 x (100/200) =100 | |
| Year 3 | 100 | 200 | 100 | 300 | 250 | 250 x (100/300) = 83.33 | |
| Year 4 | 100 | 200 | 200 | 400 | 300 | 300 x (100/400) = 75 | |

**C. The Medicare Statute Provides for Expedited Judicial Review of a Challenge to the Fellow Penalty Regulation.**

28. Section 1878(a)(1)(A)(i) of the Social Security Act entitles a provider of services under the Medicare program to a hearing before the Provider Reimbursement Review Board ("PRRB") if three prerequisites are met: (i) the provider is dissatisfied with a final determination

of the Secretary as to the amount of the payment under the Medicare Act; (ii) the provider files a request for hearing within 180 days of the final determination (typically an NPR); and (iii) the amount in controversy is at least $10,000 for an individual appeal or $50,000 for a group appeal. 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835. If an appeal satisfies these requirements, the PRRB has jurisdiction to hear the appeal. *Id.*

29. When the PRRB has jurisdiction to hear an appeal, but the appeal involves a statute, regulation, or policy that the PRRB is without authority to overturn, the PRRB may, through its own motion or upon request of the provider, grant expedited judicial review ("EJR") of the appeal. 42 U.S.C. § 1395oo(f)(1). If EJR is granted, the provider can seek judicial review in federal court without first having a hearing before the PRRB. *Id.* The provider must file its complaint no later than 60 days after receiving notice of the PRRB's decision to grant EJR. *Id.*

30. The Medicare statute allows providers to bring a civil action under the standards of the Administrative Procedure Act (APA) through EJR. *See* 42 U.S.C. § 1395oo(f)(l).

31. The APA provides that the "reviewing court shall ... hold unlawful and set aside agency action ... found to be ... (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2).

## V. PROCEDURAL HISTORY

32. Pursuant to the procedures set forth at 42 U.S.C. § 1395oo, GWU Hospital challenged, and is dissatisfied with, the Secretary's treatment of its claims for DGME reimbursement as described in the preceding paragraphs. GWU Hospital filed a PRRB appeal which satisfied all jurisdictional requirements for an appeal set forth at 42 U.S.C. § 1395oo(a)-(b).

33. GWU Hospital proceeded before the PRRB pursuant to Section 1878(a)(1)(A)(i) of the Social Security Act, 42 U.S.C. §§ 1395oo(a)(1)(A)(i). GWU Hospital satisfied the jurisdictional requirements for a Board appeal under this provision. GWU Hospital (i) received a notice of program reimbursement (NPR) and was dissatisfied with that NPR; (ii) submitted an appeal in which the amount in controversy was over $50,000, and (iii) filed its request for a hearing before the Board within 180 days after receiving its NPR.

34. On January 31, 2020, the PRRB determined that it had jurisdiction to hear GWU Hospital's appeal, but that it lacked authority to decide the legal questions at issue in this case. The PRRB therefore granted EJR for GWU Hospital on that date. A copy of the PRRB's EJC decision is attached as Exhibit A.

35. GWU Hospital now files this civil action within 60 days of the date on which it received notification of the PRRB's EJR decision.

36. GWU Hospital trained both IRP residents and fellows, and the total number of residents it trained in the cost reporting period at issue in this case exceeded its FTE cap. GWU Hospital is therefore subject to the fellow penalty under the Secretary's regulation. Because the Secretary exceeded his statutory authority, and acted arbitrarily and capriciously, in imposing the fellow penalty on GWU Hospital, this suit seeks to invalidate the Secretary's regulation and requests a proper calculation of the DGME reimbursement owed to GWU Hospital.

## COUNT I

### Violation of the Medicare Statute and the Administrative Procedure Act: Agency Action Not in Accordance with Law

37. The allegations set forth in paragraphs 1 through 36 are incorporated by reference as if fully set forth herein.

38. The APA, as incorporated into the Medicare statute, permits judicial review of agency actions, findings, and conclusions that are "not in accordance with law" or are "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. §§ 706(2)(A), 706(2)(C).

39. The Secretary's fellow penalty regulation is unlawful because it violates the plain meaning of the statute governing GME payments, 42 U.S.C. § 1395ww(h).  That statute sets forth in precise terms the calculation of the "weighted average number of full-time-equivalent residents" and the statutory cap that applies to this calculation.  The Secretary's regulation unlawfully substitutes the statute with a new formula that imposes a different, lower cap that is neither found, nor has any basis, in the statutory text.

40. The Secretary's fellow penalty regulation is unlawful because it unreasonably interprets Section 1395ww(h).  Under the fellow penalty regulation, a hospital subject to the FTE cap *loses* reimbursement for each additional fellow it trains.  Congress plainly intended, in enacting the GME reimbursement statute, that the Medicare program would pay its fair share, up to the statutory cap, for the training both of IRP residents and of fellows, and for the valuable patient-care services that both residents and fellows provide.  Yet the Secretary's regulation, unreasonably, converts the statute into a provision that penalizes hospitals for training fellows, and that takes reimbursement *away* from hospitals in exchange for the valuable patient-care services those fellows provide to Medicare beneficiaries.

41. The Secretary's fellow penalty regulation further violates the Medicare statute's prohibition on cross-subsidization of Medicare beneficiaries.  The Medicare statute guarantees that the costs of delivering covered services to Medicare beneficiaries "will not be borne by individuals not so covered."  42 U.S.C. § 1395x(v)(1)(A).  Because the fellow penalty regulation not only denies reimbursement to hospitals for their costs in training fellows, but actually takes

payment away from hospitals for each fellow that they train, the regulation forces the cost of patient care provided by fellows to Medicare beneficiaries to be borne by third parties.

WHEREFORE, GWU Hospital respectfully requests the Court to enter judgment in its favor:

    (a)  Declaring invalid and enjoining the Secretary from applying the fellow penalty regulation, 42 C.F.R. § 413.79(c)(2)(iii), for purposes of calculating GWU Hospital's DGME reimbursement for the cost reporting period at issue in this litigation;

    (b)  Directing the Secretary to calculate GWU Hospital's DGME reimbursement in a manner consistent with that Order, and to make prompt payment of any additional amounts due GWU Hospital plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2);

    (c)  Requiring the Secretary to pay legal fees and cost of suit incurred by GWU Hospital; and

    (d)  Providing such other relief as the Court may consider appropriate.

## COUNT II

### Violation of the Medicare Statute and the Administrative Procedure Act: Arbitrary and Capricious Agency Action

42. The allegations set forth in paragraphs 1 through 41 are incorporated by reference as if fully set forth herein.

43. The APA, as incorporated into the Medicare statute, permits judicial review of agency actions, findings, and conclusions that are "arbitrary, capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

44. The Secretary's fellow penalty regulation is arbitrary and capricious because it imposes a formula for the calculation of GME reimbursement that has no basis in the statutory text, and because the formula irrationally penalizes hospitals for training fellows. Under the

fellow penalty regulation, each hospital that is subject to the FTE cap will lose more and more reimbursement for each additional fellow it trains. Congress did not intend to penalize hospitals for training more residents than they may claim for DGME reimbursement under the FTE cap. Nor does the "fellow penalty" advance any public policy purpose; instead, taking reimbursement away from hospitals for each fellow trained above its cap is especially irrational, as even the Secretary has acknowledged that residents and fellows provide valuable patient-care services to Medicare beneficiaries. *See*, *e.g.*, 54 Fed. Reg. at 40,302. There is, therefore, no possible rationale for a rule where the more patient-care services a hospital provides through its fellows, the more money is taken away from the hospital.

45. The irrationality of the Secretary's "fellow penalty" policy is underscored by the fact that the Secretary would reimburse a hospital for the same services performed by a fellow under different circumstances, such as if the fellow was in an unapproved program or "moonlighting." *See* 42 C.F.R. § 415.202 (providing payments based on a percentage of reasonable costs for "services of a resident who is not in any approved GME program"); 42 C.F.R. § 415.208(b)(3) (providing reimbursement for the services of a moonlighting resident or fellow under the physician fee-schedule since "the services of the moonlighting physician are considered to have been furnished by the individual in his or her capacity as a physician, rather than in the capacity of a resident").

46. The Secretary's policy of penalizing hospitals for training residents while operating above their FTE caps is arbitrary and capricious in several additional respects. First, the Secretary has failed to articulate a satisfactory explanation for his action. In the rulemaking adopting the fellow penalty regulation, the Secretary did not provide any explanation for why his chosen formula was necessary to implement the FTE cap. 62 Fed. Reg. 45,966, 46,005 (Aug. 29,

1997). Nor did the Secretary explain why it is appropriate or consistent with the statute to penalize hospitals for training fellows while operating above their FTE caps. *Id.*

47. Second, the Secretary's failure to explain his reasoning indicates that he entirely failed to consider an important aspect of the problem, namely, the extent to which his chosen formula for calculating allowable FTEs would penalize hospitals that train fellows and operate over their FTE caps.

48. Third, the Secretary failed to consider significant, viable, obvious, and available alternatives. The most obvious and viable alternative would be to follow the language of the statute, as the Secretary is required to do, and to pay hospitals for the "weighted average number" of their full-time-equivalent residents, up to the statutory cap. This formula is dictated by the statute, which serves Congress's obvious intent to reimburse, not to penalize, hospitals for training fellows who provide care to Medicare beneficiaries. Yet the Secretary failed to consider this obvious alternative when he adopted the fellow penalty regulation that violates, rather than interprets, the statute.

49. Fourth, in adopting the fellow penalty regulation, the Secretary relied on factors that Congress did not intend him to consider in calculating hospital DGME payments. In particular, Congress has not authorized the Secretary, in determining a hospital's DGME payment, to consider whether and to what extent a hospital is training fellows while operating in excess of its FTE cap. Yet the fellow penalty regulation does just that.

WHEREFORE, GWU Hospital respectfully requests the Court to enter judgment in its favor:

(a) Declaring invalid and enjoining the Secretary from applying the fellow penalty regulation, 42 C.F.R. § 413.79(c)(2)(iii), for purposes of calculating GWU Hospital's DGME reimbursement for the cost reporting period at issue in this litigation;

(b) Directing the Secretary to calculate GWU Hospital's DGME reimbursement in a manner consistent with that Order, and to make prompt payment of any additional amounts due GWU Hospital plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2);

(c) Requiring the Secretary to pay legal fees and cost of suit incurred by GWU Hospital; and

(d) Providing such other relief as the Court may consider appropriate.

**STEVENS & LEE, P.C.**

Dated: March 26, 2020

/s/ Elliott J. Stein
Elliott J. Stein  D.C. Bar No. 389067
Princeton Pike Corporate Center
100 Lenox Drive
Lawrenceville, NJ 08648
Tel: 609.987.7050
Fax: 610.371.8506
E-Mail: ejs@stevenslee.com

*Attorneys for Plaintiff*

E. Thomas Henefer
(Pro Hac Vice to be filed)
**STEVENS & LEE, P.C.**
111 North Sixth Street
P.O. Box 679
Reading, Pennsylvania  19603
Telephone:  (610) 478-2000
Facsimile:  (610) 988-0803
E-mail: eth@stevenslee.com

*Of counsel for Plaintiff*